Good afternoon. May it please the court, I'm William Hanagami on behalf of the relator and appellant James Swobin. In this matter, the underlying court abused its discretion by refusing to permit Swobin to file an amended complaint. This would be the fourth amendment, right? That is correct, Your Honor, but this is in the situation where this is the refute, the court's refusal to grant leave to amend happened in the context of the only time that the complaint, or in this case the third amended complaint, was attacked by way of motion to Or it's important to understand the context of the prior pleadings. The original complaint, which was filed under seal, under the False Claims Act, was against, solely against defendant's scam, and did not involve any of the, what I call the retrospective review, or short term would be auditing fraud, claims that are the subject of this appeal. So the original complaint did not have anything to do with the type of fraudulent claims that we're talking about here. Then, shortly after the original complaint was filed, we filed a first amended complaint, which did allege these types of claims, but against scam and one defendant. We then filed a, subsequently, a second amended complaint, which added claims against scam, and then a third amended complaint was filed, which added the retrospective review claims against the other defendants in this case. All of those complaints were filed under seal and submitted to the government while the government conducted a lengthy investigation. Then, sometime after the third amended complaint was filed, the government settled part of the case against scam, but declined to intervene as to the balance. And so then the third amended complaint was then served upon the non-scam defendants, which resulted in the motion to dismiss. During the meet and confer process, Swobin agreed, after doing some research, to dismiss some of the claims against the non-scam defendants, the appellees herein, which had to do with violations of the California False Claims Act, and those claims were dismissed. And so what was the subject of the motions to dismiss filed by the non-scam defendants, or the appellees here, had to do with the retrospective review claims. During the process of preparing the oppositions to these motions to dismiss, Swobin's counsel became aware of additional facts which were relevant to the retrospective review claims, and decided to then simply to request the court for leave to file a fourth amended complaint based upon these new facts. Can you explain for me your theory of fraud? Yes. With regard to the retrospective reviews, because these organizations don't have to conduct a retrospective review. That is true. So is it that by conducting, voluntarily undertaking a retrospective review, but yet looking at only one side of the equation versus the other, that somehow that rendered the certifications false? Yes. Basically, let me back up a little bit. Unlike standard commercial HMOs situations where the payor pays a monthly capitated premium to the HMO, in Medicare Advantage, what we have is we have a base rate which is calculated, determined by the demographics of the patient, the age, where they live, that type of thing. And then that is adjusted according to a formula which is devised by CMS, which we call the risk adjustment, which is determined by the year's worth of diagnoses for the patient. And that's during a given year for a particular patient, you look at their diagnoses, you then put it into a formula which determines which of these diagnoses are chronic conditions like COPD, various types of cancers and the like. And then that determines a risk factor which is multiplied, it's a multiplier against the base rate to then prospectively determine for the following year what the capitated rate that CMS will pay the HMO for that particular patient. Under CMS rules, the HMOs can, but again are not required, but they can conduct what we call retrospective reviews. That is, sometime after the performance of the services for that given year, the HMOs and their contracted health care providers can essentially audit or review the medical records for that prior year to the basis upon which these retrospective reviews were designed and performed in addition with what we say before. So are you saying then that in the retrospective review process, the HMOs or the health care providers can't take a snapshot? Because they've got, I'm assuming, procedures in place to basically report the data, right? And so now, voluntarily, they're going to say, well, let me just take a little snapshot to make sure that we're accurately reporting the information to the government. And so once you undertake a retrospective review, your theory, as I understand it, you've got to go back and look at everything. You can't just take a little snapshot or present basically a review based on one medical record of each patient, for example. No, that is not what we're saying. And that is not what we've alleged. You're saying that they only look for underpayments, underreporting. Right. Basically, the way the retrospective review is supposed to be performed, like virtually any other type of audit, whether it's a medical record audit, a financial audit, whatever, you look at the records, you look at the source documents, and what should be coming out of a retrospective review are basically three buckets of diagnosis codes. The first bucket should be the largest, which is, they should be, the first bucket of diagnosis codes are those diagnoses which are supported by the reviewed medical records, which happen to also be previously reported to CMS back when the services were provided. That's the largest bucket. There's no problem there. The second bucket of diagnosis codes in a retrospective review are those diagnoses that are supported by the reviewed medical charts, which had not been submitted to CMS. Those results in what I call ads. Now those are being submitted to CMS to add to the diagnoses and therefore the risk adjustment factors, which will increase the cap paid payments paid to the HMO. It's the third bucket of diagnosis codes that forms the basis of our complaint and is part of the fraudulent scheme that we're here about today. And that is, the retrospective review should also identify those diagnoses that had been submitted by the medical records. What's supposed to happen in a retrospective review is that those previously submitted diagnosis codes, that upon being retrospectively reviewed, were not supported by the medical records, the HMO is supposed to notify CMS and say, we withdraw those. In other words, you report the good, but you also got to report the bad. If you're going to submit the ads, you got to withdraw the deletes. And that's what's not going on here. Now a lot of that is because of the way they designed the retrospective reviews, primarily through a process we call blind coding. In other words, the HMOs tell their coders, the people who are supposed to conduct the retrospective reviews, they tell them, these are the various medical charts you're supposed to review for a particular given year. But what the HMOs did not do is provide... Let me go back and make sure I understand. Picking up on your analogy, the certification is only as the bucket one, right? The certification is the reported codes are accurate, the diagnosis codes. So what you're saying is that once you amend that by doing an audit to then supplement it with bucket number two, you've then also got to reach bucket number three in order for the certification to be accurate? No, Your Honor. The certifications which are presented by the HMOs to CMS go to all of the risk adjustment data, or in this case diagnosis codes, which have been submitted to CMS. That includes the diagnoses that are routinely recorded almost on a daily basis as the services are given, but also includes the risk adjustment data including the diagnosis codes that were submitted as part of the retrospective review. Right, I got it. Okay, we turn to the pleading then. You've described it in helpful detail here, but the issue comes down to the particularity under Rule 9 as to the who, what, where, when, and how with respect to the various defendants. Thank you. And I don't know how you meet that standard, and your proposed Fourth Amendment amended complaint doesn't get down to the particularity. Your Honor, I believe it does. Under the EBIDT case, of course, we are not required to show a particular example. But you are required, and I'm looking at the case, alleging fraud requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct. And then you must set forth what is false or misleading about a statement. And it rejects the notion that you can have a relaxed standard, at least as they were addressing, because the relator in that case was a, or the plaintiff was a outsider, not an insider. But here we have an insider. So where is the particularity as to what these five defendants, including the ones you with the creation of the ICE radar template? This is a data file format. Yes, but to, which was attached to which defendants? All of them. All of them. And the reason for it, Your Honor, is because the ICE radar template was designed by a non-profit organization which had members, all of whose members were part of the various defendants. And they all participated in the creation of the ICE radar template. The ICE radar template was supposed to be designed by the industry to help, to have a uniform method of collecting data, particularly as a result of the retrospective reviews. And then to be, so that they could collect the data and then eventually submit it to CMS using a CMS particular format. The ICE radar template was designed to not allow the HMOs to record the negatives, the withdrawals. It only permitted the ads. It was designed to exclude bucket three. Correct. Okay. Only include bucket two, but to exclude bucket three. So that's the scheme. That is part of the scheme. What's the next step? The next step is how they conducted the retrospective reviews. Which was? They, all the defendants. They all did the same thing. Okay. And that is the blind coding. Blind coding means that you tell your coders, the people who are doing the reviews of the medical records, here's a list of the medical records I want you look at. Go out and find me what the diagnosis codes are. They're supported by. It's blind because these coders. Don't step away from the mic. It's called blind coding because the coders are not told what diagnoses had been previously submitted to CMS. So when a coder looks at, does the retrospective review of a medical chart, they will only find, create one bucket of information essentially, which is these are the codes that are supported by these properly documented medical charts that I've reviewed. So in other words, the codes they come out with are only codes that either come out in bucket one, which are the ones that have been previously submitted, or comes up with diagnosis codes in bucket two, which are, these are codes which are supported by the medical records, but had not been previously submitted. By blind coding, the coders can never find the bucket three because they don't know what was submitted. How do they know that it was underreported, that it was in bucket two? The coders? Yeah. When you come up with these codes, the HMO can determine which are essentially duplicates and which ones aren't. Okay. Well, I'm having trouble following this, but what's the next step then? That's it? Well. I mean, that's the fraud and all defendants are engaged in that fraud. Exactly. That is the core. With knowledge that that's what they were doing. Yes. Because they are the ones that, their employees were involved in designing the ICE radar template, which was designed to omit bucket three. Okay, so it's the template, but what they're, the blind coding. And the blind coding. Doesn't allow them to, because they're not going beyond the template, they're not going to get bucket three. Correct. By doing blind coding, it's, again, it's a retrospective review or audit. Of a select, of a selected subset. Correct. And it results in, it's only, it's basically designed as a revenue enhancement vehicle, which is to only result in submitting more diagnosis codes to CMS, the so-called ads, but never withdrawing the previously submitted, unsupported diagnosis. How do we know that all the defendants did that? Or is that alleged, that all defendants did that? That is alleged in the complaint, Your Honor. Can you point to an example? Oh boy. Because I see a lot of and-ors in your pleading. Well, that's certainly one of the things that we will be correcting in. Well, this is your fourth amendment, amended complaint. We never got to file it. Well, didn't you attach it? No. What happened was, after we requested leave to amend, the court below issued an order to show cause and instructed us to submit declarations that we submitted, indicating what additional facts. Yes. And I'm looking at a complaint that has bolded additions that said, this is the new information. Is that not what you're asking? That is what we're talking about. Well, I'm looking at it. So? I'm sorry? Well, you said something about amending further. I don't know where that comes from, because I understood that we were looking at and evaluating what you had proposed to file. Right. And this is what you're talking about by amending further, the document? Correct. That forms the basis of the additional allegations that we've issued. No, he's asking you about that document, which includes your additional allegations. Do you understand? Is there another document yet to appear? No. Okay, this is it. Looking for an example where you can say with particularity which of these defendants were engaged in it. Can you say all? All of them, because they all conducted the same type of retrospective reviews. And there's also a commonality here, which is that one of the defendants, Molina, is sued in its capacity as a healthcare provider, not as an HMO. And Molina is a contracted provider for each one of the defendant health plans, and Molina conducted its own retrospective reviews on behalf of its various HMO clients. And Molina also just did the blind coding. Molina also had employees who were involved in the creation of the ICE radar template. Okay, I'm looking at a paragraph 15, ER 311, I guess. Yeah, 311. Secure horizons and healthcare partners improperly conceived, planned, and conducted the coder's review. Okay, that's two of the defendants. Right. Okay, rather the procedures and methods developed and used by healthcare partners and secure horizons were biased in favor of upcoding. That's the same two defendants. Right. Where does it talk about the other defendants? It's part of this, even as part of the underlying scheme. I think it should be in a different part of the proposal. Unfortunately, I don't have it in front of me. Well, it's only the Fourth Amendment amended complaint we're talking about. Okay, I'm surprised you don't have it. I think I've taken you over your time. Thank you, Your Honor. I want to just address a couple of more things, if I may. That is one which has to do with... You have to do it very quickly. You're way over your time already. Thank you, Your Honor. And that has to do with the public disclosure argument. This has to do with the courts finding that the RADV audit allegations somehow triggered the public disclosure bar. The RADV audits results were not publicly available, therefore never publicly disclosed. And the RADV audits only have to do with roughly 200 medical charts selected by a Medicare HMO, which are to be audited by CMS. And what happens as a result of that is, to the extent there are failures, in other words, the documents don't support the diagnoses, then what happens is that CMS fails those particular diagnoses that were submitted, and those are then withdrawn by CMS. However, there is no public disclosure, even though the RADV audit rates are not publicly available. This does not trigger the public disclosure bar as it pertains to the retrospective review or audit fraud claims, because it's apples and oranges. The RADV audits do not disclose this fraudulent scheme so far as not withdrawing previously submitted unsupported diagnosis codes through its 15. Thank you, Your Honor. Good afternoon, Your Honor. My name is David Schindler. I represent and healthcare partners. Counsel for each of them are here. In the interest of time, we've agreed that I would represent all of them, but I would like to start with a proposition Judge Fischer noted, which is a real concern all of the appellees have with lumping. The proposed complaint and the proposed amended complaint, of course, does exactly what Judge Fischer noted, lumps all of the appellees into one bucket, and there's absolutely no particularity with respect to any of the individual defendants here. Well, there's more as to healthcare partners and UnitedHealthcare, I would agree with you on Aetna, WellPoint, and HealthNet, but you might focus at least taking down the two big players, because you'll sweep in, I guess, the others if you're persuasive. Absolutely, and I think it's important to focus on what the question for the court is today. It goes back to the procedural history here. The question for the court is whether the district court abused its discretion in denying leave to amend. This is not an appeal from the dismissal of the third amended complaint. It is an appeal focused specifically on the question of whether the district court abused its discretion in denying leave to amend, which in turn focuses, as Judge Fischer has indicated, on these two additional facts that Mr. Swobin sought to include in filing this proposed fourth amended complaint. Much of the discussion that has happened so far with counsel has related to the underlying merits and to a deconstruction of the question of how these audits occurred, and I'm happy to get into that because I want to try and resolve some of the problems with his description of what happened here. But in order to understand the procedural history, as the court noted, what happened here is the district court had initially issued an order to show cause based upon what had happened in the failure to meet and confer. Mr. Swobin came forward with two additional facts. The first was the question of this ICE radar template. The second was the question of these RABI audits that had been done, these prior audits that CMS had indicated and published previously. It is those two facts and those two facts alone that are really before the court in terms of the determination made by the district court as to the futility of amendment. This is the first time you had served up the deficiency of the complaint with respect to this, so this is really the fact that there were prior amendments were not directed at this go from there. I think that's right with one nuance, Judge Fischer, and that is that with respect to the undue delay question, which we come back to and which the district court found, with respect to the second amended complaint and the time lag and the period of time that Mr. Swobin had been aware of these two new facts, what the district court found was, and Mr. Hanagami in his declaration acknowledged as much, Mr. Swobin was aware of these two facts. Yes, but you hadn't challenged this. I had not challenged. That is true, and that's what makes this case a little bit different in the sense that by virtue of the fact that the court had issued the OSC, it effectively became like a second version, a second evaluation, because there was the first challenge that we made. Rather than oppose it, he asked for leave to amend. By virtue of now submitting the second one, he'd had the benefit of our briefing. The court gave him an opportunity effectively to amend through this OSC process. So in essence, to your question, it really amounted to a second evaluation because the court at that juncture was evaluating what it was that Mr. Swobin sought to add. So if we're going to do a count, probably two is a fairer assessment of that. And in many respects, this is the quintessential futility case. As the court looks back on its jurisprudence, it is a quintessential futility case layered on top of it with the undue delay that went in the form of the six or seven years that Mr. Swobin was aware of the facts that he sought to proffer as new facts. What the record from the standpoint of the issues on appeal, the district court undertook the kind of analysis that this court has always said and that the court set forth in FOMA, which is, is there with respect to the new facts alleged, will it change the analysis? And we respectfully submit that the district court in its 10-page single-space ruling undertook that analysis and concluded, and it was not an abuse of discretion for the district court to conclude as a factual matter, that these two additional facts would not change the inquiry and would not cure the defects in this complaint. The defects fundamentally being the defects Judge Fisher, you've already noted, and that is the failure to plead fraud with particularity as required under 9b, the failure to identify even a single instance of a false claim. That is the sine qua non of a false claims act case. And Swobin has yet to identify a single instance of a medical record or a diagnosis code that was false and an instance of any of the appellees falsely certifying that the medical records that had been submitted up the food chain were false. And it's in this context that I want to just answer what Judge Nguyen was asking. The process that's employed here is that physicians see patients. Physicians initially code or have coders who look at the patient. The patient can have multiple doctors, can have multiple encounters. Each of those encounters, each of those visits to the hospital, each of those visits to the physician will generate these codes. The codes move upstream. Judge Nguyen, as you noted, they get passed along to the HMOs, ultimately are passed along to CMS. The aggregate total, all of those codes get put together into the hopper to create this risk score that Mr. Haneghani was referring to. Why does that become important? It's important because the notion of trying to allege, which he is not, that any medical record or any particular encounter, quote unquote, should have been removed, begs the ultimate question of how the entirety of the medical record is received and used at CMS. Fundamentally, as Judge Nguyen asked before, blind coding is not inappropriate. It is not improper. There's no statute. There's no rule. There's nothing about that that suggests a, quote unquote, entitled to go back, review one single encounter, have other coders come in, see what they see in that process. What's most important here is Mr. Swobin is not alleging that any of the appellees designed a process that specifically told people don't look at other records. That's not what this retrospective review was. This wasn't a case and still is not a case where Mr. Swobin is alleging that any of the appellees had any knowledge of any false or unsupported claims or unsupported medical diagnoses that have made their way up the food chain. And it's that... I expect that there are unsupported codes, then you'd have to aggregate or gather up all of the patient's records to figure that out. Would that be the process? That's exactly right. In order to make a determination as to whether any code is unsupported, you would have to have every single medical record pertaining to that beneficiary, you'd have to go through an exercise of looking at every one of those and all of the codes attached to all of the encounters. So if the beneficiary has been to the hospital 10 times and seen 20 physicians, you've got 30 different medical records you would have to deconstruct in order to make a determination that a particular diagnosis code was unsupported. That's not what Mr. Swobin is alleging, that's not what occurred here, and in fact what he's 9B. Well, I'm not so sure. I'm looking at paragraphs 15 through 18. That's pretty specific. Well, it's specific in... At least as to health care partners. And it's specific in the context that the retrospective reviews took place. In terms of the underlying merits, Your Honor, the notion that the retrospective reviews took place, that they were blind-coded, all that is true. But they don't give rise to an inference of fraud. They don't give rise to the specificity needed under 9B of indicating that there was, in fact, a false claim that derived from the specific process. The theory which I think does parse out of the complaint is, as he described it, which is that they design the retrospective review to purposely ignore over-reporting and only were looking to add on to the previously submitted certifications, and therefore they skewed the design knowing that all they would be correcting, as far as CMS is concerned, was that they'd been under-reimbursed, even though they knew that there would also be or could be, but they designed it to exclude looking for it where they had represented services that, in fact, were not needed or given. And then they designed, as he laid out today, a scheme, a methodology to achieve that result. And then somewhere I see a reference to there were 20 percent of the bucket, you know, that third bucket counts 20 percent of the total. That's his allegation. Okay. And what is it that, I always forget the, I don't know how to pronounce it, e-bide or e-bide? I'm unclear if it's e-bide or e-bide as well. E-bide, whatever. So it does say that you're not required to allege all facts supporting each and every instance of billing, but it has to be some level of specificity to give notice to the particular defendants about particular misconduct, and then must also supply reasonable indicia that false claims were actually submitted. And I take it that what he's trying to do by these, what his theory is, is to say, with this construct in mind, it's reasonable, it's a reasonable indicator that there were false claims, even if he can't, because he doesn't have access to the data, even though that would be enough to satisfy a bid. And with all due respect, Your Honor, it wouldn't. It amounts wholly to speculation, because Mr. Swobin has never looked at any of for whom there was an inaccurate diagnosis code reported by a physician. Did he have access to those so he could do that? He did not. I'm sorry. Did he have access so he could allege that? He did not. Could he take discovery to find it out? In that context, he's circumventing 9b when the data is done. Yeah, exactly. So it's catch-22. It is, but that's why both in the Gonzalez case and the Abeyed case, even the Abeyed case, in terms of the pleading standards, makes clear it was inadequate. And what we have... It doesn't. I just read you out of Abeyed, and if he lays out sufficient, it says he doesn't have to lay out particularity each and every false record, but he has to lay out enough so that the defendants know what it is that they're being tied to. He hasn't tied all the defendants to this scheme, but he has tied some. No, but with respect to the Abeyed, Your Honor, the outcome in Abeyed, while it had this pleading standard that you've just identified, Abeyed makes clear that the relator must still supply reasonable indicia that false claims were actually submitted. That's what I just quoted. And in that case, the court, the Ninth Circuit, and the district court found the second amended complaint didn't either. And here, the district court looked at the proposed amended complaint through these additional facts, made a determination that it did not satisfy that standard. And the question before the court is, did the district court abuse its discretion? Yes, and that's what I'm trying to get to address. Why isn't the scheme that he's laid out, where there's a whole bucket, as he's The way he's constructed is not how the allegations are set forth. What he says, and what he alleges, is they engaged in blind coding, blind review, a blind coding review. No, he talks also about the program, the ICE program being skewed. He says that. Sure, but what we're talking about is a tool. And just because he calls it skewed or takes the word language terms, it's a tool. It's an Excel spreadsheet. It's a template. Whatever it is, it's designed to exclude a category of certification documentation. It's not designed to exclude. It's instead designed to include. And I don't mean that to sound semantics. This goes back to the notion of blind coding. By virtue of a blind coding review, you won't have an underlying review of all the medical records, which would allow you to make a determination as to whether there is something to be excluded. If the allegation was that in creating blind coding, the appellee somehow violated a rule, a regulation, the law, or I'm losing you. Maybe I'm just not understanding. But the structure, if you create a tool that is going to not only look for upgrades or... It'll just look for codes. Look for codes, but it's designed and the selection, as I understand it, that the coders get, then, is selected according to that ICE system. Is that correct? I'm sorry, you didn't hear the last part? The records that the coders are looking for, the audited blind coding part, are they the records that they get presented to them to audit pre-selected by the ICE template? No. I'm over my time, so I want to answer your question. All that happens is the initial coding results that the physicians have sent up are selected and reviewed blindly. It's a value neutral. What do you see, Mr. Reviewer, in this? I see an A, a B, or C. Okay, you saw whether they were documented or not. Not whether they were documented or not. It's just what do you document in this file? That's all it is. I see A, B, C. There's no question posed, did you go back and deconstruct or observe whether D is not there? That is not part of that review. Okay, then what do the parties submit to CMS for adjusted reimbursement upward? Well, then the additional codes, if there are any, get submitted up. By what process? It's an electronic process. It all goes into CMS aggregated together with all the historical codes. It won't include, that electronic process won't include over claims, right? Assuming there are any, and that's the problem with this complaint. It's all based on speculation that there are over, as he calls it, upcoding, or as Judge Fisher, you've called it over claiming. That's all ranks, that is pure speculation, and that's why, in this case, what the district court found wasn't an abuse of discretion. He still has not come up with a single instance of, quote unquote, false claims. You're saying there's nothing in the design of the tool that would exclude the upcoding or upreporting, whatever? Because it's a neutral exercise that's blind. If, in fact, it had been the other way, if the allegation here was that these people went in, did multiple reviews, found explicitly, deconstructed all the medical records, knew full well that there were multiple codes that were not supported, and then deliberately chose not to include them, we'd have a different case. But that's not this case. And we respectfully submit the district court did not abuse its discretion in concluding that these two new facts did not change the inquiry, that this complaint did not satisfy 9b. Thank you, counsel. We'll give you two minutes for rebuttal. Thank you. Thank you, Your Honor. I'll try to be brief. First of all, I would like to point out that I misspoke when I mentioned the health care provider, Molina. I was wrong. It's actually healthcare partners. I wanted to go further on the issue of the RADB audit issue. Why don't you correct my confusion about the link between your ICE and the blind coding? Is it true that there's nothing in the blind coding that has any relation to the ICE? No, they're connected. They're connected in the sense that this is part of a fraudulent scheme to not notify CMS of the withdraws or the deletes. They go hand in hand. And how does that happen mechanically? The ICE radar template was designed to only allow the coders to input ads. There is no way in which to put deletes. The way that the template is used is it's used to collect the data by HMO or by healthcare provider. When you say a coder puts in a code, what would be the code that he would input to identify? It would be the patient's Medicare number. It would also include the diagnosis code for that patient, the date of service, those types of things. But the problem is that it was never designed to have a field or an indicator to say, this has to be deleted. Now that's compared to the format of the data that's actually submitted to CMS. But there is a field that says this needs to be added? No. It's just, this is what's going to be added. That's it. Okay. Your Honor. Let me clarify. Not added, but that these are the codes reflected in this medical chart. And then at some point it gets reconciled because then it will be reported as duplicates. Right. But the fact is, is that the data that's actually... So it's blind in the sense that you look at the medical record and you say, okay, well, I see codes A, B, C, D, and E, and maybe four of it got reported instead of five. And then the fifth one results in an extra payment. It's not a selection to exclude anything. Actually, it is because they're performing it as blind coding. Other than the design, the structure that you talked about. Right. That's what I'm saying. The proper way to do this kind of retrospective review is to provide the coders with the diagnosis codes that had been supported. That way the coders can figure out, okay, these have already been submitted. Fine. These are new codes. Okay. And then here are the codes that we previously submitted that are not by the medical records. Those codes have to be deleted from CMS. That's why the blind coding was designed to not have to accumulate the third bucket. Also, when we look at the way that the template was designed, there's no way to delete. All right. Thank you, counsel. Thank you. Case just argued will be submitted. The court will stand in recess for the day.
judges: Reinhardt, Fisher, Nguyen